BERGER, Judge.
Respondent-mother and Respondent-father (collectively, "Respondents") appeal from the trial court's termination of their parental rights as to their son, K.N.C.H. ("Kenny"[1] ). On appeal, Respondents both argue that (1) there was insufficient evidence to support either of the trial court's statutory bases for terminating their parental rights; and Respondent-mother further contends that (2) the trial court lacked subject matter jurisdiction to terminate her parental rights. We affirm.
Factual and Procedural Background
Kenny was born out of wedlock to Respondent-mother and Respondent-father on September 25, 2015. Respondent-mother and Kenny lived with Respondent-father for about seven months after Kenny's birth. In April 2016, Respondent-mother and Kenny moved out of Respondent-father's residence and began residing with Michael Cox ("Mr. Cox") and his wife ("Mrs. Cox"). Soon thereafter, Mrs. Cox discovered that Mr. Cox and Respondent-mother were having an affair and evicted Mr. Cox, Respondent-mother, and Kenny from her home. For the next several weeks, Mr. Cox, Respondent-mother, and Kenny temporarily resided with various friends and family.
On May 19, 2016, when Kenny was seven months old, Respondent-mother's distant relative dropped Kenny off at the Columbus County Department of Social Services ("CCDSS"). At that time, Kenny had a fever, diarrhea, and a severe diaper rash, and neither Respondent-mother nor Respondent-father knew Kenny's location or who dropped Kenny off with CCDSS. The following day, CCDSS filed its juvenile petition alleging that Kenny was neglected and dependent.
CCDSS was granted non-secure custody of Kenny on May 24, 2016. During the May 24, 2016 non-secure custody hearing, Respondent-father claimed that "he would love to have [Kenny] placed with him," but he was unable to take care of him due to his work schedule. While visiting Kenny on June 29, 2016, Respondent-father informed the social worker that his work schedule had not changed, so he was "still not able to care for [Kenny]."
On July 21, 2016, the trial court entered an order adjudicating Kenny to be a dependent juvenile based, in relevant part, on the following findings of fact:
7. That the respondent mother, by and through her attorney of record stipulated and agreed that the juvenile is dependent as defined in NCGS 7B-101 in that the juvenile's parent, guardian, or custodian is unable to provide for the juvenile's care or supervision and lacks an appropriate alternative child care arrangement.
8. That the respondent father, by and through his attorney of record[,] stipulated and agreed that the juvenile is dependent as defined in NCGS 7B-101 in that the juvenile's parent, guardian, or custodian is unable to provide for the juvenile's care or supervision and lacks an appropriate alternative child care arrangement.
9. That respondent mother and respondent father's stipulation was reduced to writing; signed by the respondent mother and respondent father on separate but identical copies, and read into the Court's record as follows: ...
["]That at the time of the filing of the Petition the parents were unable to provide for the juvenile's care or supervision and lacked an appropriate child care arrangement. The mother needs substance abuse counseling and the father needs suitable housing and child care arrangements.
The parties acknowledge that from these Facts the court may enter an adjudication."
10. That the parties affirmatively acknowledged that the above stipulation is indeed the stipulation.
11. That under oath and upon examination by the Court, the respondent mother affirmatively acknowledged that:
a. She acknowledged that it is her signature that appears on the stipulation.
b. She understands that the purpose of the hearing was to determine whether or not the juvenile was, at the time of the filing of the petition, neglected or dependent as those terms are defined in North Carolina statutes;
c. Her mind is currently free of influence of any alcohol, drugs, narcotics, medicines, or any kind of mind altering substance and understands what is going on during this hearing;
d. She had an opportunity to discuss the purpose of today's hearing with her attorney, ask questions of her attorney relating to this procedure, and to give her attorney the facts of the case as she understands or believes them to be;
e. She is satisfied with the representation provided by her attorney;
f. She understands that the stipulation, if accepted by the Court, would result in a finding that the child is dependent and that the Court would proceed to a dispositional hearing, wherein appropriate orders would be entered relating to the continuing custody of the child, which could include placement of the child with CCDSS or some person other than herself;
g. She authorized her attorney to enter into the stipulation on her behalf and understands the factual basis of the stipulation;
h. She personally admits that the allegations of dependency are true and that the child is dependent or was dependent at the time of the filing of the petition as set forth in the stipulation;
i. She entered into the stipulation of her own free will, fully understanding what she was doing and was not promised anything or threatened in anyway (sic ) to enter the stipulation against her wishes.
Although omitted here for brevity, the trial court reiterated Finding #11 with respect to Respondent-father in Finding #12.
That same day, the trial court also entered a disposition order mandating Respondents to "accomplish certain goals as preconditions to their being reunified" with Kenny. Respondent-mother was ordered to complete parenting classes, a substance-abuse program, and a mental-health assessment; to provide CCDSS with proof of her prescribed medications; and to establish "suitable and independent housing" and "her own sufficient income." Respondent-father was ordered to undergo a substance-abuse assessment, participate in parenting classes, and pass random drug screenings.
On July 22, 2016, Respondent-father tested positive for THC (marijuana). He was not surprised by the results and admitted that he smoked marijuana to "calm him down and allow him to relax after a long day." That same day, Respondent-mother tested positive for oxycodone and benzodiazepines. She claimed that she did not know "how she tested positive and then she stated the people she reside[d] with put it in her milk."
Respondent-mother offered a placement option for Kenny on August 8, 2016, which she promptly withdrew when she was reminded that the individual she recommended was a recovering drug addict. On August 16, 2016, Respondent-mother tested positive for tramadol and benzodiazepines. She did not have a prescription for either medication.
While Respondent-father was in town on August 24, 2016, he had an unscheduled visit with Kenny and informed the social worker that "his work schedule [was] his biggest obstacle" preventing him from completing his case plan. That same day, Respondent-father again tested positive for THC (marijuana). Respondent-father admitted that he "smokes marijuana but never around his son and never to the point of where he is unable to take care of him."
On October 26, 2016, a social worker reported that Respondent-mother appeared to be visibly intoxicated during her scheduled visit with Kenny. Respondent-mother claimed that she "was stressed," so she had taken Xanax and Adderall. Respondent-mother was again unable to show that these medications had been prescribed to her.
On November 7, 2016, Respondent-mother submitted to a random drug test, in which she tested positive for amphetamines and benzodiazepines. At that time, the social worker encouraged her to participate in an inpatient treatment program to detox from all prescribed and non-prescribed drugs. Respondent-mother "adamantly" opposed treatment and stated that she "don't need to rear [Kenny] because she is still using and her fiancé is enabling her."
A review hearing was scheduled for October 4, 2016, but it was continued until December 1, 2016, as neither Respondent-father nor Respondent-mother were in attendance. During the December 1, 2016 review hearing, Respondent-mother was in attendance, but Respondent-father was not present. Respondent-father's attorney was released from the hearing because he had "no contact with nor received instruction from [R]espondent-father." The trial court concluded that it was "in the best interests of the juvenile that custody remain with CCDSS" as "the conditions that led to the removal of the juvenile from the juvenile's home continue[d] to exist."
On January 4, 2017, a social worker discussed Respondent-mother's case plan with her and stressed that Respondent-mother was not making sufficient progress on her case plan partially due to her "unhealthy relationship with her fiancé, his jealousy issues, [and] how he enable[d] her." In response, Respondent-mother blamed everyone but herself for her current situation and "refuse[d] to believe that she ha[d] a drug problem."
On January 31, 2017, another review hearing was held, in which Respondent-father was again absent while Respondent-mother was in attendance. After noting that Respondent-mother had begun to make some progress on her case plan, the trial court found that Respondent-father was "not engaged in the pursuit of any of his case plan items and [was] not visiting with the juvenile. He has not submitted to a substance abuse assessment and has not participated in parenting classes." The trial court again concluded that it was "in the best interests of the juvenile that custody remain with CCDSS" as "the conditions that led to the removal of the juvenile from the juvenile's home continue[d] to exist."
On February 8, 2017, Respondent-father informed Kenny's social worker that "he knows he is not in position to care for [Kenny]." Additionally, Respondent-father stated that he would like for Kenny to remain with his foster parents because Kenny was "in a great place and with a family that takes good care of him."
A permanency plan hearing was set for May 9, 2017, but it was postponed until May 24 as neither Respondent-mother nor Respondent-father were in attendance. The May 24 hearing was further postponed until June 5 as neither Respondent-mother nor Respondent-father were in attendance. Respondent-mother made a belated appearance at the June 5 hearing, while Respondent-father again did not appear. On June 6, 2017, the trial court granted Respondent-father's attorney's motion to withdraw as counsel because Respondent-father had not been communicating with him.
On June 30, 2017, the trial court entered a written order and made the following, relevant findings of fact:
14. That respondent father's employment is out-of-town extensively and prevents him from being capable of being a placement option for the juvenile. ...
15. That respondent mother obtained housing recently, which was evaluated by CCDSS on May 11, 2017 and found to be sufficient. Respondent mother has lived in this home for about 6-7 months.
16. That respondent mother is receiving mental health and substance abuse counseling through Allied.
17. That respondent mother had negative drug screens on February 8, 2017 and April 4 and 26, 2017. Respondent mother was positive for ecstasy on March 16, 2017.
18. That the evaluation of respondent mother's progress in substance abuse recovery leaves her counselors concerned that progress is minimal and with concerns that she attempts to obtain drugs legally at the Emergency Room so that she is in compliance with her counseling.
19. That respondent mother's boyfriend Michael Cox was the defendant in a petition respondent mother took out for domestic violence.
20. That respondent mother received a domestic violence order which was subsequently dismissed on merits.
21. That respondent mother continued her relationship with Mr. Cox subsequent to the referenced actions.
22. That Mr. Cox is a controlling influence in respondent mother's life.
23. That respondent mother has no means of income. She has applied for disability but was denied. She is dependent on others to sustain a minimal life style.
24. That Mr. Cox pays most of the bills.
25. That the Court notes that respondent mother['s] testimony that her mother reimburses Mr. Cox lacks credibility. Even if this were true, respondent mother is not able to sustain housing expenses due to no means of income at the present time.
26. That the Court received the psychological evaluation of respondent mother and she is diagnosed with Opioid Use Disorder, Severe; Cannabis Use Disorder, Moderate; Posttraumatic Stress Disorder with Dissociative Features; Persistent Depressive Disorder (Dysthymia ) with Intermittent Depressive Episodes, with Current Episode; and Borderline Intellectual Functioning.
27. That the Court finds that respondent mother functions in the borderline range of cognitive ability. As a practical manner, this level of functioning would have respondent mother becoming confused and requiring assistance and guidance from other (sic ) concerning not only her needs and welfare but those of the juvenile.
28. That respondent mother has not made adequate progress under her plan.
Based on these findings, the trial court concluded, in relevant part:
12. That the best permanent plans to achieve a safe, permanent home for the juvenile within a reasonable period of time is a primary plan of adoption and a secondary plan of guardianship with a court approved caretaker.
13. That continued efforts of reunification with respondent parents would clearly be futile, unsuccessful and inconsistent with the juvenile's health, safety and need for a safe, permanent home within a reasonable period of time.
In September 2017, Respondent-mother was homeless, tested positive for amphetamine, and was unable to show that this was one of her prescribed medications. Respondent-mother blamed her positive drug test on her recent break up with her fiancé, Mr. Cox, who was currently incarcerated for domestic abuse charges filed against him by Respondent-mother.
In early October 2017, Respondent-mother reunited with Respondent-father. Neither Respondent-mother nor Respondent-father appeared for the next six scheduled visitations with Kenny.
A subsequent permanency planning hearing was set for November 2, 2017, but it was postponed until November 27, 2017, as neither Respondent-mother nor Respondent-father were in attendance. CCDSS filed a petition seeking the termination of Respondents' parental rights on November 20, 2017 (the "TPR Petition").
At the November 27, 2017 permanency planning hearing, Respondent-mother was present while Respondent-father was again absent. On December 18, 2017, the trial court entered a written order, in which the trial court made the following, relevant findings of fact:
11. That respondent mother continues to have housing difficulties.
12. That respondent mother has terminated substance abuse counseling.
13. That on September 15, 2017, respondent mother tested positive for Adderall (sic ) for which she had no prescription.
14. That there is no evidence of further progress on respondent mother's case plan.
15. That respondent mother has terminated her relationship with a man with whom she was residing and has moved to respondent father's home in Wayne County.
16. That respondent father continues to take the position that he is unable to care for the juvenile.
The trial court concluded that the best permanent plan "to achieve a safe, permanent home for the juvenile within a reasonable period of time is a primary plan of adoption and a secondary plan of guardianship with a court approved caretaker."
The next permanency planning hearing was held on May 3, 2018 with neither Respondent-father nor Respondent-mother in attendance. Nevertheless, the trial court proceeded with the hearing as both Respondents were represented by counsel. The trial court entered a written order on May 29, in which the trial court made the following, relevant findings of fact:
12. That respondent mother is believed to be living in Wayne County and is 6 months pregnant.
13. That respondent mother resumed a relationship with respondent father, terminated that relationship and is now living with another man in the Goldsboro area.
14. That respondent mother's case plan included substance abuse assessment, mental health counseling, parenting classes, stable housing, and independent living. Respondent mother has failed to complete any portion of her case plan.
15. That respondent father is currently incarcerated with no known release date.
16. That respondent father's case plan included random drug screens, substance abuse assessment and parenting classes. Respondent father has failed to complete any portion of his case plan.
17. That respondent parents were originally scheduled to have visitation with the juvenile 2 hours per week. There have been no physical visits or telephone calls since December 28, 2017.
18. That respondent parents have not made adequate progress on their respective case plans in a timely manner.
19. That respondent parents are not actively participating in and cooperating with the plan, CCDSS and the GAL.
20. That respondent parents are not available to this Court and does not maintain contact with CCDSS or GAL.
The trial court concluded that the best permanent plan "to achieve a safe, permanent home for the juvenile within a reasonable period of time is a primary plan of adoption and a secondary plan of guardianship with a court approved caretaker."
The TPR Petition was heard on May 25, 2018, with all parties present. At the time of the hearing, Respondent-father had been incarcerated in Duplin County awaiting trial on a trafficking opiates charge from January 22, 2018. During the hearing, Cynthia Jones ("Jones"), the CCDSS social worker assigned to Kenny's case, testified that when CCDSS filed the TPR Petition, both Respondent-father and Respondent-mother had failed to timely comply with their individual case plans. As of the May 25 hearing, Respondent-mother had not consistently passed her random drug screenings, obtained gainful employment, established independent housing, or completed the substance abuse program. Jones further testified that Respondent-father had told her that he "was unable to provide care for [Kenny]," so "it would be in [Kenny's] best interests" if his foster parents adopted him.
On June 25, 2018, the trial court entered two orders in response to the TPR Petition: the "Order of Adjudication on Termination of Parental Rights" (the "Adjudication Order"), in which the trial court concluded that statutory grounds existed to terminate Respondents' parental rights; and the "Order of Disposition as to Petition for Termination of Parental Rights" (the "Disposition Order"), in which the trial court concluded that the best interests of the child would be served by terminating Respondents' parental rights.
Both Respondent-mother and Respondent-father timely appealed from the Adjudication and Disposition Orders. However, Appellees moved to dismiss Respondent-father's appeal because his notice of appeal stated that he was appealing from "the Order Terminating Parental Rights Order that was entered June 25th, 2018." In their November 5, 2018 motion to dismiss, Appellees argue that Respondent-father's notice had not correctly referred to either the Adjudication Order or the Disposition Order, but seemed to be appealing only the Disposition Order. Because all of Respondent-father's arguments on appeal focus on the Adjudication Order, Appellees argue that this bars our review of Respondent-father's appeal. In response, Respondent-father argues that his intent to appeal both the Adjudication Order and Disposition Order "can be fairly inferred" from his notice of appeal, and thus, any defect in his notice of appeal does not warrant dismissal. Respondent-father also filed a petition for a writ of certiorari asking this Court for review of his appeal of both the Adjudication and Disposition Orders.
Respondent-father may have made a mistake in his designation of the order upon which he intended to appeal. However,
[i]t is well established that a mistake in designating the judgment, or in designating the part appealed from if only a part is designated, should not result in loss of the appeal as long as the intent to appeal from a specific judgment can be fairly inferred from the notice and the appellee is not misled by the mistake.
Phelps Staffing, LLC v. S.C. Phelps, Inc. , 217 N.C. App. 403, 410, 720 S.E.2d 785, 791 (2011) (purgandum[2] ).
Here, Respondent-father's intent to appeal from both the Adjudication Order and the Disposition Order can be fairly inferred from his notice of appeal, which had stated that his appeal was from "the Order Terminating Parental Rights Order that was entered June 25th, 2018." Both orders had included the phrase, "Termination of Parental Rights," and the Disposition Order depended on the trial court's conclusions in the Adjudication Order. From this, it can be fairly inferred that Respondent-father intended to appeal from both orders. Moreover, Appellees filed their brief on November 8, 2018, three days after filing their motion to dismiss claiming to have been misled by Respondent-father's notice of appeal. However, Appellees' brief clearly and directly responds to all of Respondent-father's issues on appeal, which all arise from the Adjudication Order. Therefore, we reject Appellees' claim that they were misled into believing that Respondent-father only noticed appeal from the Disposition Order and deny Appellees' motion to dismiss Respondent-father's appeal. As this resolution renders Respondent-father's petition for writ of certiorari unnecessary, we further dismiss Respondent-father's petition for writ of certiorari as moot.
Although Respondents timely noticed appeal from both the Adjudication Order and the Disposition Order, neither Respondent-father nor Respondent-mother specifically contest the Disposition Order by challenging the trial court's conclusion that the termination of their parental rights was in the best interest of the child. Accordingly, appellate review of the Disposition Order is waived, see N.C.R. App. P. 28(b)(6), and our review is limited to the Adjudication Order.
Jurisdiction
Respondent-mother first argues that the trial court lacked subject-matter jurisdiction to terminate her parental rights because of a discrepancy between how Kenny's name appears in the caption of the custody order and how it appears on Kenny's birth certificate and in the caption of the TPR Petition itself. We disagree.
District courts "shall have exclusive original jurisdiction to hear and determine any petition or motion relating to termination of parental rights to any juvenile who resides in, is found in, or is in the legal or actual custody of a county department of social services or licensed child-placing agency in the district at the time of filing of the petition or motion." N.C. Gen. Stat. § 7B-1101 (2017). "Where there is no proper petition, however, the trial court has no jurisdiction to enter an order for termination of parental rights." In re Z.T.B. , 170 N.C. App. 564, 568, 613 S.E.2d 298, 300 (2005) (citations omitted). "The requirements for a proper petition to terminate parental rights are set forth in the North Carolina General Statutes, [S]ection 7B-1104 ...." Id. In relevant part, Section 7B-1104 states:
The petition, or motion pursuant to G.S. 7B-1102, shall be verified by the petitioner or movant and shall be entitled "In Re (last name of juvenile), a minor juvenile", who shall be a party to the action, and shall set forth such of the following facts as are known; and with respect to the facts which are unknown the petitioner or movant shall so state:
(1) The name of the juvenile as it appears on the juvenile's birth certificate, the date and place of birth, and the county where the juvenile is presently residing.
N.C. Gen. Stat. § 7B-1104(1) (2017). Generally, the failure of the petitioner to set forth information required by Section 7B-1104 will only be held to be reversible error upon a showing that the respondent was "prejudiced as a result of the omission." In re Humphrey , 156 N.C. App. 533, 539, 577 S.E.2d 421, 426 (2003).
Here, the only difference between the names listed is that the custody order reflects Kenny's middle and last name while the TPR Petition notes his full name. As the TPR Petition lists Kenny's full name "as it appears on the juvenile's birth certificate," it properly complied with Section 7B-1104(1). Moreover, Respondent-mother has failed to demonstrate that she was prejudiced as a result of the name discrepancy between the custody order and TPR Petition. Thus, the trial court had subject matter jurisdiction to adjudicate this matter.
Analysis
A proceeding to terminate parental rights is a two step process with an adjudicatory stage and a dispositional stage. A different standard of review applies to each stage. In the adjudicatory stage, the burden is on the petitioner to prove by clear, cogent, and convincing evidence that one of the grounds for termination of parental rights set forth in N.C. Gen. Stat. § 7B-1111(a) exists.
In re C.C. , 173 N.C. App. 375, 380, 618 S.E.2d 813, 817 (2005) (citations omitted). "A finding of any one of the enumerated grounds for termination of parental rights under N.C.G.S. 7B-1111 is sufficient to support a termination." In re Humphrey , 156 N.C. App. at 540, 577 S.E.2d at 426 (citation omitted). "Thus, on appeal, if we determine that any one of the statutory grounds enumerated in § 7B-1111(a) is supported by findings of fact based on competent evidence, we need not address the remaining grounds." In re N.T.U. , 234 N.C. App. 722, 733, 760 S.E.2d 49, 57 (2014) (citation omitted).
The standard for appellate review is whether the trial court's findings of fact are supported by clear, cogent, and convincing evidence and whether those findings of fact support its conclusions of law. Clear, cogent, and convincing describes an evidentiary standard stricter than a preponderance of the evidence, but less stringent than proof beyond a reasonable doubt.
In re C.C. , 173 N.C. App. at 380, 618 S.E.2d at 817 (citations and quotation marks omitted). "It is the duty of the trial judge to consider and weigh all of the competent evidence, and to determine the credibility of the witnesses and the weight to be given their testimony." In re S.C.R. , 198 N.C. App. 525, 531-32, 679 S.E.2d 905, 909 (2009) (purgandum ).
It is well settled that findings of fact made by the trial court in a termination of parental rights proceeding are binding where there is some evidence to support those findings, even though the evidence might sustain findings to the contrary. Findings of fact are also binding if they are not challenged on appeal. Moreover, if such findings sufficiently support one ground for termination, this Court need not address a respondent's challenges to findings of fact that support alternate grounds for termination.
In re N.T.U. , 234 N.C. App. at 733-34, 760 S.E.2d at 57 (citations and quotation marks omitted).
If the petitioner meets its burden of proving at least one ground for termination of parental rights exists under N.C. Gen. Stat. § 7B-1111(a), the court proceeds to the dispositional phase and determines whether termination of parental rights is in the best interests of the child. The standard of review of the dispositional stage is whether the trial court abused its discretion in terminating parental rights.
In re C.C. , 173 N.C. App. at 380-81, 618 S.E.2d at 817 (citations omitted).
I. Respondent-Mother's Appeal
Respondent-mother argues that the trial court erred by determining that grounds existed to terminate her parental rights under Section 7B-1111(a)(2) and (a)(6). As we affirm that grounds existed under Section 7B-1111(a)(2), we need not review the trial court's determination that grounds also existed under Section 7B-1111(a)(6).
Section 7B-1111(a)(2) provides that the trial court may terminate parental rights upon a finding that
[t]he parent has willfully left the juvenile in foster care or placement outside the home for more than 12 months without showing to the satisfaction of the court that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of the juvenile. Provided, however, that no parental rights shall be terminated for the sole reason that the parents are unable to care for the juvenile on account of their poverty.
N.C. Gen. Stat. § 7B-1111(a)(2) (2017).
Thus, to find grounds to terminate a parent's rights under G.S. § 7B-1111(a)(2), the trial court must perform a two part analysis. The trial court must determine by clear, cogent and convincing evidence that a child has been willfully left by the parent in foster care or placement outside the home for over twelve months, and, further, that as of the time of the hearing, as demonstrated by clear, cogent and convincing evidence, the parent has not made reasonable progress under the circumstances to correct the conditions which led to the removal of the child. Evidence and findings which support a determination of "reasonable progress" may parallel or differ from that which supports the determination of "willfulness" in leaving the child in placement outside the home.
A finding of willfulness does not require a showing of fault by the parent. Willfulness is established when the respondent had the ability to show reasonable progress, but was unwilling to make the effort. A finding of willfulness is not precluded even if the respondent has made some efforts to regain custody of the children.
With respect to the requirement that the petitioner demonstrate that the parent has not shown reasonable progress, ... evidence supporting this determination is not limited to that which falls during the twelve month period next preceding the filing of the motion or petition to terminate parental rights.
In re O.C. , 171 N.C. App. 457, 464-65, 615 S.E.2d 391, 396 (2005) (citations and quotation marks omitted). The "nature and extent of the parent's reasonable progress ... is evaluated for the duration leading up to the hearing on the motion or petition to terminate parental rights." In re A.C.F. , 176 N.C. App. 520, 528, 626 S.E.2d 729, 735 (2006) (emphasis omitted).
Here, the trial court concluded that Respondent-mother "willfully left the juvenile in foster care for more than 12 months without showing to the Court's satisfaction that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of the juvenile." In support of this conclusion, the trial court made the following findings of fact in the Adjudication Order:
1. That the petitioner is the CCDSS to which custody of this child has been given pursuant to a petition alleging abuse, neglect and dependency with a nonsecure custody order entered on the 20th day of May, 2016, filed in Columbus County File 16JA26 ....
...
22. That the juvenile has continuously been in the custody of CCDSS and placed outside the home of respondent parents since May 20, 2016.
...
26. That the July 21, 2016 disposition order in the underlying abuse/neglect/dependency file 16JA26 required respondent mother to:
a. submit to a comprehensive clinical assessment and follow recommendations resulting therefrom.
b. attend parenting classes and complete within the time limit established by the provider.
c. make efforts to become financially self-sufficient.
d. provide to CCDSS within 48 hours of the hearing date a listing of all current prescribed medications and bring the original prescription or the original container in which the prescription was received.
e. update prescribed medications listing within 48 hours of any changes.
27. That subsequent to the entry of that order, respondent mother did not complete the recommendations from the assessment and was terminated from the program because of lack of attendance.
28. That this Court finds respondent mother's stated reasons for not attending lack credibility.
29. That this Court finds that the termination of respondent mother's substance abuse counseling occurred in the early months of 2017 and respondent mother willfully failed to return.
30. That respondent mother's housing has been fluid. Respondent mother lived with respondent father on a "sometimes" basis-sometimes they were together and sometimes they were not.
31. That respondent mother was living with respondent father when the juvenile was born on September 25, 2015 and continued living with him for 7-8 months thereafter.
32. That respondent mother left respondent father and moved in with Michael Cox and his wife until his wife asked respondent mother and Mr. Cox to leave. Mr. Cox and respondent mother then moved in with Mr. Cox's father. Mr. Cox and respondent mother left Mr. Cox's father's place in the Spring of 2016.
33. That respondent mother continued to reside with Mr. Cox, living in the homes of various friends. A home was established on Happy Home Road in July 2017 and respondent mother stayed there for approximately 4 months.
34. That in the Fall of 2017 respondent mother left Mr. Cox and moved in with respondent father in Duplin County.
35. That the relationship between Michael Cox and respondent mother was one of domestic violence toward respondent mother.
36. That the transient nature of respondent mother's housing as well as her domestic violent relationship with Mr. Cox made the situation unsuitable for the juvenile.
37. That at no time from CCDSS receiving custody of the juvenile to the filing of the termination of parental rights petition did respondent mother establish stable, suitable housing for the juvenile.
38. That this Court finds that the relationship between respondent mother and Michael Cox was willful.
39. That respondent mother willfully failed to complete parenting classes and was without credible explanation for not doing so.
40. That respondent mother has no appropriate housing and her absence from substance abuse counseling and parenting classes render respondent mother incapable to care for the juvenile prior to the date of the filing of this petition and there is a reasonable probability that this will continue in the foreseeable future.
...
51. That CCDSS filed this petition to terminate parental rights on November 20, 2017.
...
53. That respondent parents have willfully left the juvenile in foster care in excess of twelve months without showing to the Court's satisfaction any progress to correct the matters which caused the child to be removed from respondent parent's custody.
54. That the matters to which respondent parents failed to attend were not because of poverty.
...
58. That the respondent parents have willfully left the juvenile in foster care for more than six months next preceding the filing of this action.
Respondent-mother argues that the trial court made "contradictory findings" in Findings #53 and 58 regarding whether the 12-month period of foster care, as required by Section 7B-1111(a)(2), had been satisfied. Respondent-mother argues that "[o]ne finding stating 'in excess of twelve months' supports, while the other finding stating 'for more than six months' simply does not meet the requirement of that period being 'more than twelve months' as [ Section 7B-1111(a)(2) ] requires." However, Respondent-mother's argument and interpretation of the trial court's findings of fact are misguided. The trial court's findings show that Kenny had continuously been in court-ordered foster care since May 20, 2016. Finding #53 reflects that Kenny had been left in foster care for more than twelve months before CCDSS filed the TPR Petition on November 20, 2017. Finding #58 simply highlights that Kenny had remained in foster care for another six months between the filing of the TPR Petition on November 20, 2017 and the termination hearing on May 25, 2018. These two findings are not contradictory and support the trial court's conclusion that Kenny remained in foster care for more than twelve months preceding the filing of the TPR Petition, as required under Section 7B-1111(a)(2).
As Respondent-mother does not challenge any other findings of fact, these findings are binding on appeal. See In re L.R.S. , 237 N.C. App. 16, 18, 764 S.E.2d 908, 909 (2014) ("The trial court's findings of fact which an appellant does not specifically dispute on appeal are deemed to be supported by sufficient evidence and are binding on appeal." (citation and quotation marks omitted)). Undisputed Findings #26, 27, 30-37, and 40 support the trial court's conclusion that Respondent-mother had not made reasonable progress under the circumstances to correct the conditions that led to Kenny's placement in foster care. Moreover, unchallenged Findings #28, 29, 38, and 39 support the trial court's conclusion that Respondent-mother willfully left Kenny in foster care for more than two years preceding the May 25, 2018 hearing, had the ability to make reasonable progress, and provided "no credible explanation for not doing so."
Taken together, these findings of fact support the trial court's conclusion that Respondent-mother "willfully left the juvenile in foster care or placement outside the home for more than 12 months without showing to the satisfaction of the court that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of the juvenile." N.C. Gen. Stat. § 7B-1111(a)(2). Therefore, we affirm the trial court's conclusion that at least one statutory ground existed to terminate Respondent-mother's parental rights.
II. Respondent-Father's Appeal
Respondent-father argues that the trial court erred by determining that grounds existed to terminate his parental rights under Section 7B-1111(a)(2) and (a)(6). As we affirm that grounds existed under Section 7B-1111(a)(6), we need not review the trial court's determination that grounds also existed under Section 7B-1111(a)(2).
Section 7B-1111(a)(6) provides that the trial court may terminate parental rights upon a finding that
the parent is incapable of providing for the proper care and supervision of the juvenile, such that the juvenile is a dependent juvenile within the meaning of G.S. 7B-101, and that there is a reasonable probability that the incapability will continue for the foreseeable future. Incapability under this subdivision may be the result of substance abuse, mental retardation, mental illness, organic brain syndrome, or any other cause or condition that renders the parent unable or unavailable to parent the juvenile and the parent lacks an appropriate alternative child care arrangement.
N.C. Gen. Stat. § 7B-1111(a)(6).
A "[d]ependant juvenile" is defined as "[a] juvenile in need of assistance or placement because (i) the juvenile has no parent, guardian, or custodian responsible for the juvenile's care or supervision or (ii) the juvenile's parent, guardian, or custodian is unable to provide for the juvenile's care or supervision and lacks an appropriate alternative child care arrangement." N.C. Gen. Stat. § 7B-101(9) (2017). "Under this definition, the trial court's findings must address both (1) the parent's ability to provide care or supervision, and (2) the availability to the parent of alternative child care arrangements." In re J.K.C. , 218 N.C. App. 22, 40, 721 S.E.2d 264, 276 (2012) (citation and quotation marks omitted).
"Termination of parental rights based upon N.C. Gen. Stat. § 7B-1111(a)(6) does not require that the parent's incapability be permanent or that its duration be precisely known. Instead, this ground for termination merely requires that there is a reasonable probability that such incapability will continue for the foreseeable future." In re N.T.U. , 234 N.C. App. at 735, 760 S.E.2d at 58 (citation and quotation marks omitted). Moreover, "[w]e note that incarceration, standing alone, is neither a sword nor a shield in a termination of parental rights decision. As such, while a parent's imprisonment is relevant to the trial court's determination of whether a statutory ground for termination exists, it is not determinative." Id. (purgandum ).
Here, the trial court concluded that Respondent-father (1) had "no appropriate alternative child care arrangement" and (2) was "incapable of providing care for and supervision of the juvenile, such that the juvenile is dependent within the meaning of N.C. Gen. Stat. § 7B-101, and that there is a reasonable probability that such incapability will continue for the foreseeable future." Respondent-father exclusively challenges the trial court's determination that he was currently incapable of providing for Kenny's care and will remain incapable for the foreseeable future. However, this conclusion is supported by the following findings of fact:
20. That respondent father ... is currently incarcerated in Duplin County awaiting trial on the January 22, 2018 charge of trafficking opiates.
...
44. That this Court finds that respondent father's job required him to be out of town for extended periods of time.
...
46. That respondent father's work schedule caused him to communicate to CCDSS during the abuse/neglect/dependency proceedings that he would not be a placement option for the juvenile. That position of respondent father never changed during the pendency of the underlying matter. Respondent father never offered himself as an option or placement.
...
48. That, as indicated above, due to respondent father's long working hours, he is not able to properly care for and supervise the juvenile and such inability continues through his current incarceration. There is a reasonable probability that, in the absence of the current incarceration, respondent father's inability to properly care for and supervise the juvenile would continue for the foreseeable future.
...
55. That this Court finds that during the pendency of the underlying proceedings in this matter, the juvenile has been in need of placement because there was no parent able to provide for the juvenile's care or supervision and no appropriate alternative child care arrangement.
56. That the juvenile was dependent at the time he came in to CCDSS custody.
57. That there is a high likelihood that the dependency will continue if the juvenile is returned to respondent parents arising from respondent parents' incapacity as set forth hereinabove for the foreseeable future.
These findings, especially Finding #46, illustrate that Respondent-father consistently admitted he was incapable of caring for his child. This, coupled with Respondent-father's current incarceration and pending trial, supports the trial court's classification of Kenny as a dependent child and conclusion that Respondent-father was incapable of providing for Kenny's care and supervision.
Accordingly, the trial court's Adjudication Order contained sufficient findings of fact, supported by clear, cogent, and convincing evidence, to establish that Respondent-father was "incapable of providing for the proper care and supervision of the juvenile, such that the juvenile is a dependent juvenile within the meaning of G.S. 7B-101, and that there is a reasonable probability that the incapability will continue for the foreseeable future." N.C. Gen. Stat. § 7B-1111(a)(6). Therefore, we affirm the trial court's conclusion that at least one statutory ground existed to terminate Respondent-father's parental rights.
Conclusion
We affirm the trial court's Adjudication Order finding statutory grounds to terminate Respondent-mother and Respondent-father's parental rights. As Respondents have waived appellate review of the Disposition Order, we affirm the trial court's termination of Respondent-mother and Respondent-father's parental rights.
AFFIRMED.
Report per Rule 30(e).
Judge HAMPSON concurs.
Judge ZACHARY concurs in result only.

The pseudonym "Kenny" is used throughout this opinion to protect the privacy of the minor child and for ease of reading.

Our shortening of the Latin phrase "Lex purgandum est. " This phrase, which roughly translates "that which is superfluous must be removed from the law," was used by Dr. Martin Luther during the Heidelberg Disputation on April 26, 1518 in which Dr. Luther elaborated on his theology of sovereign grace. Here, we use purgandum to simply mean that there has been the removal of superfluous items, such as quotation marks, ellipses, brackets, citations, and the like, for ease of reading.